1  Michael Protack, In Pro Per
   P.O. Box 112
2  Seal Beach, CA  90740
   (302) 690-8872
3

4  Plaintiff In Pro Per

5



FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

JAN 2℗ 2021

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

6

7              **IN THE UNITED STATES DISTRICT COURT**

8              **FOR THE NORTHERN DISTRICT OF GEORGIA**

9                        **ATLANTA DIVISION**

                                              **1:21-CV-0406**

10  MICHAEL PROTACK, an individual,  )  Civil Action No.

11                        Plaintiff,  )  **COMPLAINT FOR DAMAGES AND**
                                      )  **INJUNCTIVE RELIEF FOR:**
12        v.                          )
                                      )  **VIOLATION OF THE AMERICANS**
13  DELTA AIR LINES, INC., a          )  **WITH DISABILITIES ACT (ADA),**
    Delaware corporation;  RICHARD    )  **42 U.S.C. §12101 ET SEQ;**
14  TERRY, an individual; ORAN        )
    CLAYTON MILLER, aka O.C.          )  **VIOLATIONS OF RAILWAY**
15  MILLER, an individual; CHRIS      )  **LABOR ACT (RLA), 45 U.S.C. § 151**
    PUCKETT, an individual; THOMAS    )  **ET SEQ.**
16  B. FAULKNER, MD, an individual;   )
    JIM GRAHAM, an individual;        )  **DISCRIMINATION IN VIOLATION**
17  DAVID ALTMAN, an individual,      )  **OF CAL. GOV'T CODE §§12940 ET**
                                      )  **SEQ.;**
18                        Defendants. )
                                      )  **HARASSMENT IN VIOLATION OF**
19  _____  **CAL. GOV'T CODE §§12940 ET**
                                         **SEQ.;**
20

21                                       **RETALIATION IN VIOLATION OF**
                                         **CAL. GOV'T CODE §§12940 ET**
22                                       **SEQ.;**

23                                       **FAILURE TO PREVENT**
24                                       **DISCRIMINATION, HARASSMENT**
                                         **AND RETALIATION IN**
25                                       **VIOLATION OF CAL. GOV'T**
                                         **CODE §12940(k);**
26

27                                       **FOR DECLARATORY**
                                         **JUDGMENT;**
28
                                         **RETALIATION IN VIOLATION OF**

                              – 1 –

              **COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

**CAL. LABOR CODE §§ 1102.5 AND 1102.6;**

**UNFAIR COMPETITION (CAL. BUS. & PROF. CODE §17200 ET SEQ.); AND**

**WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY**

**[DEMAND FOR JURY TRIAL]**

**COMES NOW PLAINTIFF, MICHAEL PROTACK,** and for causes of action against the Defendants and each of them, alleges as follows:

## I.

## NATURE OF THE CASE

1.      After decades of distinguished service as a pilot, Defendant Delta Airlines, Inc. ("Delta") removed Protack from active services for *years*, refusing to reinstate his flying privileges, unless Protack agreed to an unnecessary and intrusive psychiatric exam.

2.      Despite the Federal Aviation Administration ("FAA") repeatedly clearing Protack as being fit to fly, Delta maintained its refusal, effectively improperly "medicalizing" an employment dispute.

3.      After years of harassing and bullying Protack, and Protack refusing to be harassed and bullied by Delta, Delta withdrew its demand for a psychiatric exam and, instead, terminated Protack for false and pre textual reasons.

4.      Delta's conduct was motivated by numerous illegal factors, including Protack's union activities with respect to the Delta MEC Air Line Pilots Association, International ("ALPA") and attempts to replace the ALPA,

– 2 –

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

Delta's perception that Protack was suffering from a physical and/or mental disability, and Protack's engagement in protected activities, including the refusal to submit to the psychiatric exam and protesting the same.

5.     Protack has filed charges with the Equal Employment Opportunity Commission and the Department of Fair Employment and Housing, and has exhausted his administrative prerequisites with respect thereto.

6.     Protack now brings this action against Delta for violating the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, et seq, the Railway Labor Act ("RLA"), 45 U.S.C. § 151, et seq,, the California Fair Employment and Housing Act, Government Code 12940, et seq. (the "FEHA"), California Labor Code section 1102.5 (whistleblower), the California Unfair Practices Act, Business & Professions Code § 17200, et seq, (unfair business practices) and for wrongful termination in violation of public policy.

## II.

## JURISDICTION & VENUE

7.     Jurisdiction of this Court arises under 45 U.S.C. § 151 et seq., 42 U.S.C. §12101, et seq, 42 U.S.C. §2000e, et seq, and 28 U.S.C. § 1331. Supplemental jurisdiction exists for the state law claims under 28 U.S.C. § 1367. Declaratory relief is available under 28 U.S.C. §§ 2201 and 2202.

8.     This Court has personal jurisdiction over Defendants, and each of them, because Defendants reside or work in Georgia, and maintain sufficient minimum contacts with Georgia to render jurisdiction by this Court permissible under the traditional notions of fair play and substantial justice.

9.     Venue in this District is proper because Defendant transacts business here and the conduct giving rise to this claim arose in part in this District, and Delta has received substantial compensation in this District by doing

– 3 –

business here and engaging in numerous activities that have an effect in this District.

## III.

## THE PARTIES

10.   Plaintiff, MICHAEL PROTACK, is a natural person, who was residing in the County of Orange, State of California, at the time of certain of the conduct alleged in this complaint, including at the time of his termination.

11.   Plaintiff is informed and believes, and based thereupon alleges, that at all times relevant hereto, Defendant DELTA AIR LINES, INC. (hereinafter referred to as "Delta") was and is a Delaware corporation, engaged in the airline industry in California and other states using the instrumentalities of interstate commerce with its corporate headquarters located at Hartsfield-Jackson Atlanta International Airport, 1030 Delta Blvd., Atlanta, Georgia, 30354.

12.   At all times relevant herein, Delta was Plaintiff's employer, joint employer and/or special employers within the meaning of 42 U.S.C. § 12111(5), 42 U.S.C. §2000e(b), and California Government Code §§12926, subdivision (d), 12940, subdivisions (h), (j)(1), (j)(4)(A), and (k), and Delta was a "carrier" and Plaintiff its "employee" within the meaning of 42 U.S.C. § 151.

13.   Plaintiff is informed and believes, and based thereupon alleges, that at all times relevant hereto, Defendants RICHARD TERRY, ORAN CLAYTON MILLER aka O.C. MILLER, CHRIS PUCKETT, THOMAS B. FAULKNER, MD, and JIM GRAHAM were and are natural persons and residents of County of Fulton, State of Georgia.  In addition, DAVID ALTMAN ("ALTMAN") is and was a natural person and a resident of the

– 4 –

County of Cook, State of Illinois. Plaintiff is informed and believes and thereon alleges that at all times mentioned herein Altman was rendering services in this district and is therefore subject to the Jurisdiction of this court. The above-mentioned defendants are hereinafter individually referred to by last name and collectively referred to as the "INDIVIDUAL DEFENDANTS." The INDIVIDUAL DEFENDANTS were Delta's managers, corporate agents, supervisors, and/or employees.

14.    Plaintiff is informed and believes, and based thereupon alleges, that at all times relevant hereto, Defendants, and each of them, were the agents, employees, managing agents, supervisors, coconspirators, parent corporation, joint employers, alter egos, successors, and/or joint ventures of the other Defendants, and each of them, and in doing the things alleged herein, were acting at least in part within the course and scope of said agency, employment, conspiracy, joint employer, alter ego status, successor status and/or joint venture and with the permission and consent of each of the other Defendants.

15.    Plaintiff is informed and believes, and based thereupon alleges, that Defendants, and each of them, including the INDIVIDUAL DEFENDANTS, acted in concert with one another to commit the wrongful acts alleged herein, and aided, abetted, incited, compelled and/or coerced one another in the wrongful acts alleged herein, and/or attempted to do so, including pursuant to California Government Code §12940(i). Plaintiff is further informed and believes, and based thereupon alleges, that Defendants, and each of them, including the INDIVIDUAL DEFENDANTS, and each of them, formed and executed a conspiracy or common plan pursuant to which they would commit the unlawful acts alleged herein, with all such acts

– 5 –

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

alleged herein done as part of and pursuant to said conspiracy, intended to cause and actually causing Plaintiff harm.

16.     Whenever and wherever reference is made in this complaint to any act or failure to act by a Defendant or co-Defendant, such allegations and references shall also be deemed to mean the acts and/or failures to act by each Defendant acting individually, jointly and severally.

## IV.

## FACTUAL ALLEGATIONS

18.     Protack was hired by Delta on May 9, 1991, as a pilot, and was promoted to airline Captain in 2000.  Over the next twenty-five years, Protack performed his job duties satisfactorily and commendably.  As of October 23, 2013, when the below-mentioned misconduct commenced, Protack was 56 years old.  The mandatory retirement age for pilots is not until age 65.

19.     As a pilot, Protack performed his services for Delta throughout the entire United States, including California.  Protack has piloted Delta's airplanes into and out of the State of California hundreds of times, in and out of San Diego, Sacramento, Los Angeles, San Francisco and San Jose.  Every time Protack flew in or out of California, Protack was housed by Delta over night in California in a hotel.

20.     Over the course of his employment with Delta, Protack prolifically engaged in union-related activities, including filing several grievances and pursuing them all the way through hearing and reversing certain adverse employment decisions, and actively seeking to replace the ALPA.

21.     On June 23, 2012, Protack was injured in an automobile accident when he was hit by a hit and run driver.  Between June and August 2012, Protack was off work while he received and completed physical therapy for

– 6 –

his injuries. Protack did not take any medications or prescriptions for his injuries. During this same time period, Delta made no inquiries or asked for further clarification of Protack's medical condition.

22.    In and around September 2012, Protack was issued a valid First Class Medical Certificate by the FAA, with no restrictions, and no limitations on his return to work or ability to pilot. Delta returned Protack to work with no questions or further documentation required.

23.    Between September 2012 and November 2013, Protack received no medical treatment for his injuries, and had no defects.

24.    In and around February 2013 and August 2013, Protack was issued valid First Class Medical Certificates by the FAA, with no restrictions and no limitations on his ability to pilot.

25.    In fact, pilots are given physicals every six (6) months by the FAA to ensure their fitness to fly. Protack attended all of these physicals, and passed every exam and was deemed fit to fly.

26.    The only purported "restrictions" placed by any doctor on Protack were apparently by Protack's personal physician, who recommended Protack not fly more than 65-70 hours per month, for a total of three months. Protack did not typically fly more than those hours anyway, so this "restriction" was not even a limitation. The FAA agreed that this did not constitute a limitation or restriction. Delta had no minimum or maximum number of hours. The productivity goal for Delta pilots is 85 hours per month, but Protack always flew less than that number of hours.

27.    In the first half of 2013, citing safety concerns, Protack refused Delta's orders to fly an aircraft with corrosion which produced a hole in the bottom of the aircraft, and maintenance informed Protack they would "slap on a patch" on it. Delta continued to try to force Protack to fly this plane, but

– 7 –

Protack maintained his refusal due to safety concerns. Protack made other complaints during this time period about unsafe conditions. Indeed, throughout his employment, Protack made many protected complaints about safety and his working conditions. Most of these complaints were made to Chief Pilots in New York reporting directly to GRAHAM, who did nothing to address them.

a.     Protack made safety complaints about 3-4 times per year. Delta's response to these complaints was to attempt to discipline Plaintiff;

b.     Protack protested misogynistic comments by other pilots and co-pilots when Delta started hiring women pilots.

c.     Protack complained about his pay rate, including unwarranted and substantial pay cuts and loss of pension benefits for pilots back in 2010/2011. This same activity spurned Protack to begin petitioning for the ALPA to be replaced with a new union, the Delta Pilots Association ("DPA").

28.     Protack's most recent union petitioning activities and complaints were in Summer 2013.

29.     In and around July 2013, Protack called in sick for a trip. Delta requested medical documentation to justify the absence, and Protack provided it. Approximately six weeks later, TERRY, the Chief Pilot, asked Protack if he required further treatment for his condition, and Protack said no. Protack heard nothing again from August 20, 2013 to October 9, 2013.

30.     On October 9, 2013, Protack was given a letter removing him from service with pay, stating he had to undergo a medical review concerning his back injury and the medications he might be taking to address the issue. The medical review, according to this letter, would be conducted by FAULKNER.

– 8 –

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

31.     In October 2013, when Delta first removed Protack from service, Protack resided in the State of Delaware, and his designated base was JFK in New York City.  However, once Protack was removed from service, his base was no longer designated as "NYC."  Instead, Protack was categorized as "NBC" which  means "No Base Category."  This means, Protack no longer had a designated base, but remained an employee wherever Protack happened to be, and was no longer based out of NYC.

32.     FAULKNER requested Protack provide medical documents, which Protack did on October 15, 2013.  Protack subsequently also provided signed authorizations for releases.

33.     On October 31, 2013, Protack also obtained a validation of fitness by a Board Certified Orthopedic Surgeon, at his own cost.  This validation confirmed that Protack "has been asymptomatic since shortly after his motor vehicle accident and his examination today is benign and he is neurologically normal.  I see no contraindication to him continuing with his work activities as a pilot…"

34.     On November 3, 2013, Protack's personal physician, John E. Hocutt, Jr., M.D., sent a letter to TERRY at Delta, confirming his prior evaluation of Protack and confirming "I found no reason for Mr. Protack to be off flight status" and confirming that Protack has not taken, nor needed or requested, nor received any prescriptions for medications.

35.     Between October 2013 and December 2013, numerous communications were exchanged between FAULKNER and Protack in which FAULKNER refused to consider records provided by Protack, accused Protack of hiding records, and refused to answer Protack's questions about why certain information was required or insufficient.  Among other things, Protack was protesting the focus of FAULKNER's examination on

– 9 –

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

Protack's past medical history, when the inquiry was supposed to be about Protack's current fitness for duty.

36.     On October 23, 2013, TERRY revoked Protack's non-revenue flight privileges with Delta.  Such a revocation is ordinarily tied to some sort of discipline, and is almost always done in writing.  Here, TERRY merely revoked Protack's privileges orally, which, on information and belief, TERRY intended to be a form of discipline of Protack for protesting the Section 15 process.  Protack filed a grievance as a result of TERRY's actions.

37.     On November 21, 2013, Protack reached out to Maria Connors of the FAA concerning what he perceived to be Delta's "Witch Hunt" and attempts to invalidate Protack's FAA issued First Class Medical Certificates.

38.     On November 21, 2013, Protack initiated a grievance against TERRY and FAULKNER for violation of the Chapter 13 process, and the refusal to acknowledge the FAA's repeated findings of fitness for duty, and forwarded this grievance to GRAHAM on November 22, 2013, requesting a hearing officer as soon as possible.

39.     On December 3, 2013, the FAA's North East Region Flight Surgeon, Dr. Harriett Lester, again confirmed Protack's eligibility to hold a First Class Airman Medical Certificate.

40.     In immediate response to Protack's perceived actions of "going over Delta's head" to the FAA, on December 5, 2013, TERRY delivered to Protack a letter stating that now Delta "has concerns regarding [his] psychiatric condition" and removed Protack from service for purposes of conducting a psychiatric review, also by FAULKNER.

41.     On December 7, 2013, on Protack's behalf, Captain Hartley Phinney of the ALPA sent an email to MILLER requesting FAULKNER be removed

– 10 –

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

and that a new Director of Health Services be assigned to his medical review, on the grounds of a personality conflict between Protack and FAULKNER, and FAULKNER's delay in reviewing the records.

42.     Shortly thereafter, Protack personally requested a new physician/doctor to review his fitness for duty, as "it is clear Dr. Faulkner has failed to act within the normal bounds of review."

43.     On December 10, 2013, TERRY sent an email to MILLER concerning Protack's exchanges with FAULKNER, and inquiring whether they could characterize Protack's actions as insubordination.

44.     On December 20, 2013, Protack sent a letter to TERRY protesting the proposed psychiatric evaluation, again requesting removal of FAULKNER from the evaluation. Protack further advised that, if Delta intended to proceed with the psychiatric review, he would be pursuing a grievance of this decision.

45.     On December 23, 2013, Protack sent a letter to Delta's Captain Steve Dickson protesting the demanded psychiatric evaluation, again requesting removal of FAULKNER from the evaluation, and demanding a grievance hearing.  In this communication, Protack reiterated that he has repeatedly asked for an immediate CME to verify that Protack had no disqualifying back injury or medication use, and reminded that he has had three FAA medical examinations, an orthopedic evaluation, and a validation from Eastern Region Flight Surgeon, Dr. Harriet Lester, all whom confirmed he was fit to pilot, as well as other documentation confirming this.  Protack protested what he perceived to be an improper demand for medical and psychiatric evaluations in retaliation for having gone over Delta's head to obtain the FAA First Class Medical Certificates and requesting removal of FAULKNER.  Protack protested FAULKNER's verbal diagnoses of

– 11 –

"personality disorder" and "distortion of reality" without having ever examined him, and based upon Protack's conduct of engaging in protected activities, and without a reason or medical evidence to support such a claim. Protack requested termination of the demand for a psychiatric review and that FAULKNER be removed from any further role in evaluating Protack's satisfaction of physical standards.

46.     On December 28, 2013, PUCKETT further conspired with FAULKNER to attempt to justify the unwarranted psychiatric exam by digging through Protack's historical files and Protack's prior grievances from many years earlier, characterizing Protack's behavior as erratic, and trying to dig up anything to support Delta's new claim that Protack was psychiatrically unfit to fly.   PUCKETT further forwarded emails from other Delta employees whom he had solicited to assist with this unlawful endeavor, pulling up instances of Protack's alleged "antics" from as early as 2009, in an attempt to manufacture a current psychiatric disorder.

47.     On January 3, 2014, MILLER sent Protack a letter responding to Protack's letter to TERRY.  With respect to the psychiatric review, MILLER attempted to justify FAULKNER's continued demand therefor because FAULKNER had purportedly "noted several troubling behaviors including but not limited to a pattern of inconsistent statements/demonstrable falsehoods, detachment reality, and willfully disobedient conduct," referring to Protack's protected activities and MILLER's and/or FAULKNER's mischaracterization of them.  In conclusion, MILLER refused to withdraw the demand for the psychiatric exam, refused to even delay it so Protack could pursue a grievance, and refused to remove FAULKNER from overseeing it.

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

48.     Immediately upon receipt of MILLER's letter, Protack enlisted the assistance of the FAA and its Medicine Division, who has ultimate authority over a pilot's fitness to fly.  Protack characterized Delta's and the INDIVIDUAL DEFENDANTS' conduct as a witch hunt, and requested the FAA to intervene. Protack provided to the FAA the prior First Class Medical Certificates that had been issued within the past twelve months, and other information.

49.     In the meantime, still under FAULKNER's oversight, Dr. David B. Altman, was assigned to conduct the comprehensive psychiatric exam of Protack.  In a letter dated January 11, 2014, FAULKNER advised Dr. Altman that Delta was seeking an "independent medical evaluation when they believe a Pilot does not meet the Federal Aviation Administration - Office of Aerospace Medicine (FAA-OAM) medical standards to hold an Airman Medical Certificate," even though the FAA itself had already declared Protack fit to fly multiple times before and during Delta's witch hunt.  FAULKNER expressly advises Dr. Altman to let him know should Protack further attempt to resist the psychiatric evaluation, or fail to cooperate.  FAULKNER then advised Dr. Altman of  the purported reason for requesting the evaluation, intending to poison and predispose Dr. Altman of Delta's and FAULKNER's position, ensuring that Dr. Altman's evaluation would be anything but "independent":

> Our reasons for requesting this evaluation are related to our interactions with Captain Protack over several years and under a variety of circumstances, as well as reports of his behavior and statements from  other Delta employees and members of the general public that call into question his serving as a Pilot.  For these observations we have identified several troubling behaviors, inconsistent statements/demonstrable falsehoods, detachment from reality, and willfully disobedient conduct.

– 13 –

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

FAULKNER's description mimicked, nearly verbatim, the statements in MILLER's letter to Protack of weeks before. To further poison the well and predispose Dr. Altman, FAULKNER sent Dr. Altman six pages of narrative, a impugning Protack's character, characterizing Protack's protected activities as being delusional and obstructionist, information from internet sites concerning a decade-prior run for governor, as well as purported racist statements by Protack having nothing to do with work, piloting, Delta, Delta employees, or any other relevant matter, characterizing Protack's own opinion of himself as having integrity as being delusional and with a mental health issue.

50.    On January 14, 2014, PUCKETT further contributed to the conspiracy and railroading of Protack by forwarding to FAULKNER prior union activities of Protack from back in 1998, and misrepresenting the results. PUCKETT admitted he had done "some digging" to find this information. PUCKETT further promised FAULKNER "stand by for more documents...."

51.    In the meantime, also on January 14, 2014, the FAA issued Protack another FAA First Class Medical Certificate, this one from Dr. Alan Kozarsky.

52.    On January 30, 2014, Protack attended an appointment with Dr. Altman, who interviewed Protack for two hours.

53.    On January 31, 2014, Protack revoked his consent for Dr. Altman to receive certain of his records unless Protack was afforded the opportunity to review them, as well as other concerns.

54.    On February 1, 2014, Protack wrote a letter to Dr. Altman advising that his attorney requested four items from him: 1. the specific medical reason FAULKNER gave for the psychiatric review, including the

– 14 –

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

documentation; 2. a letter from Dr. Altman detailing his own reason for the exam and the references to First class medical issuances; 3. a written consent form for recording of interviews; and 4. a written form denoting who has access and control of these recordings.

55.     On February 21, 2014, the Captain Hartley Phinney and Gordon Rose, Esq. of the ALPA sent a letter to PUCKETT reiterating its own request for a detailed explanation of the factual basis for Delta's directive that Protack "submit to a comprehensive psychiatric evaluation (including a battery of neuro-psychological testing)," confirming that this testing "is a very serious matter," is "extremely intrusive and should not be ordered without legitimate and clearly articulated justification." The ALPA reminded PUCKETT that the original demand for a medical review was for issues relating to Protack's "neck, back and/or spine, not any psychiatric issues." ALPA further pointed that Delta had still failed to identify with specificity the factual basis for its medical directive for the psychiatric examination. ALPA further reminded that

> The PWA permits a Section 15 evaluation only when the Company has a "reason" to believe that the individual "may not meet the physical standards" to act as a pilot at Delta Air Lines. the term "standards" means "the standards established by the FAA for issuance of a First class Medical Certificate, including the FAA waiver and restriction policy." PWA Section 15.B.1 and Section 15.A.3. This contractual requirement has not been met as stated in the pending grievance on this matter. We therefore again request that the Company provide the requisite specific factual explanation, particularly with respect to the request for the psychiatric evaluation or, alternatively, cancel the directive to submit to such evaluations and immediately return Captain Protack to Duty.

56.     On February 25, 2014, Protack wrote another letter to Dr. Altman to follow up on the request for the four previous items (now his third request),

– 15 –

and to also request:  1. a list of all tests and what FAA standards they address; and 2. transcript of all recorded interviews.

57.     On February 26, 2014, Protack wrote to Dr. Charles Chesanow of the FAA again seeking the FAA's assistance to stop Delta's and FAULKNER's "witch hunt."

58.     On March 4, 2014, Delta denied Protack's grievance.

59.     On March 6, 2014, Michael A. Berry, M.D. of the FAA, in response to Protack's requests for FAA intervention, sent Protack a letter in which it was confirmed that the FAA was not currently re-examining Protack's qualifications for airman medical certification, including the one issued on January 13, 2014.

60.     On March 10, 2014, ALPA initiated another grievance by Protack against Delta on the issues of whether Delta was in violation of the Agreement by demanding Protack submit to medical, psychological and neuropsychological testing without a legitimate reason to believe he may not meet the FAA's physical standards for issuance of a First Class Medical Certificate, and/or by allowing FAULKNER to continue to participate in the evaluation despite a conflict of interest, including Protack's making  of a medical ethics complaint against FAULKNER with the Georgia Composite Medical Board (which Protack had recently done). ALPA requested the grievance be submitted to a 5-Member System Board of Adjustment for immediate adjudication.

61.     Also on March 10, 2014, Protack sent a letter to Dr. Altman.  Among other things, Protack's letter confirmed that he had discussed the matter with the FAA, and that "[t]he input from the Eastern Region FS and the Lead Psychiatrist for the FAA made it clear the FAA does not 'medicalize' work place disputes.  The FAA has no file or reason for any review and [in] over 5

– 16 –

months Delta nor Faulkner have documented a single physical standard not being met by me.  In a recent grievance Faulkner refused to detail any standards not being met."  Protack requested Dr. Altman provide the following:  1. detail the physical standards not being met by Protack; 2. the medical reason for testing; 3. the testing to be done; 4. a written consent for any recordings; 5. a written form denoting who has access/control of the recordings; and 6. information on whether blood would be drawn, tissue samples taken, etc., what the limits of such testing would be and based on what criteria.

62.    On March 11, 2014, Gordon Rose, Esq. of ALPA sent a letter to PUCKETT reiterating the request that Protack be provided with a list of the tests to which Dr. Altman has ordered him to submit.

63.    On March 13, 2014, Gordon Rose, Esq. of ALPA sent another letter to PUCKETT to reiterate the request that FAULKNER be removed as the evaluator of Protack, confirming that not only would doing so be an easy matter, "but fair process and past practice require it do so," especially in light of Protack's pending complaint with the Georgia Composite Medical board.

64.    On March 18, 2014, Gordon Rose, Esq. of the ALPA sent a letter to PUCKETT responding to his, disputing that PUCKETT had presented "a well documented history of behavior" that could be the basis for a conclusion regarding "possible psychiatric issues" of Protack.  The ALPA pointed out that if this long history of behavior existed, then there would have been reference to it somewhere in the files, which there is not.  The letter further disputed PUCKETT's purported reasons for the psychiatric exam, addressing each reason, with multiple bullet points as to each, and documentation, including the fact that "4 different AME's and 3 different

– 17 –

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

Regional Flight Surgeons have reviewed Captain Protack and found him to properly be in possession of a valid first class medical certificate."   In conclusion, the ALPA again requested Delta rescind its demand for a psychiatric evaluation of Protack.

65.   After receiving no response from Dr. Altman to the March 10, 2014 letter, on March 20, 2014, Protack resent his same letter, reiterating that the key issue is that Delta has still be unable to provide the FAA Physical Standards that Protack allegedly did not meet.

66.   In March, 2014, Protack retained counsel, Katherine Witherspoon, who sent a letter to PUCKETT on March 14, 2014 again protesting the demand for a psychiatric evaluation.   Ms. Witherspoon's letter confirmed Protack's position that the demand is "unwarranted, unreasonable, and unlawful."   Ms. Witherspoon further pointed out that the psychiatric exam is only permitted when the pilot may not meet the physical standards established by the FAA for the issuance of a first class medical certificate. The letter further pointed out:  "If every time an employee acted in a manner which might obstruct a management goal, the employer was able to subject him to a psychiatric exam, this would undermine the purposes of federal law to prevent discrimination based on an employer's perception that the employee has a disability."   The letter further pointed out that, even if all of Delta's accusations against Protack were true (though this is denied), none of these facts "constitute reasonable to cause to believe that [Protack] cannot safely pilot a plane." The letter further confirmed that Delta's demand violates the ADA, and further confirmed that, under those laws, "employers are not permitted to demand such examinations to unlawfully further their agenda to terminate an employee…Employers are permitted to require medical exams only if they are job related and consistent with business

– 18 –

necessity," which may be met when the employer reasonably believes the ability to perform an essential job function will be impaired by a medical condition, or the employee will pose a direct threat due to the medical condition, citing the EEOC Enforcement Guidance on the Americans with Disabilities Act and Psychiatric Disabilities.  The letter accused Delta of "attempting to medicalize a workplace dispute by illegally requesting the exam."  Ms. Witherspoon further confirmed that Protack had engaged in union organizing activities, and that his communications concerning this may have been intercepted, and that Delta's actions might also violate Protack's rights as a union organizer and member in violation of the RLA, and are intended to undermine Protack's union organizing efforts.  In conclusion, the letter confirmed that if Delta did not retract its demand for the mental health examination, Protack would file a charge of discrimination based on Delta's perception that he is an individual with a psychiatric disability under the ADA.

67.    On March 25, 2014, PUCKETT sent a letter to Gordon Rose, Esq. of the ALPA again refusing to remove FAULKNER from Protack's case, and refusing to withdraw the demand for a psychiatric exam.  PUCKETT's letter demand that Protack submit to neuropsychological testing on March 28th, and soon thereafter, demand that Protack make an appointment with Dr. Altman.  PUCKETT's letter further confirmed that, should Protack refuse, "[a]t that point, this matter will be treated as a disciplinary case," and went on to threaten that such track would include anything PUCKETT could think of.

68.    On April 3, 2014, Delta forced Protack to sign medical releases under threat of termination.

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

69.     Throughout this time period, Protack continued to keep Dr. Chesanow of the FAA apprised of Delta's activities and the continued "witch hunt."

70.     On April 28, 2014, Dr. Altman write to Protack in response to receiving a release to release information to Dr. Chesanow and other FAA physicians.  Dr. Altman proposed that submitting the matter to resolution by the FAA might resolve the issue of whether Protack needed to have a psychiatric/psychological evaluation, since Protack had himself sought confirmation from the FAA that he is "fit for duty," and Protack's apparent view "that their opinion matters."  Dr. Altman's letter confirmed that he had prepared a "primary report based upon the data available at this point and believe that even though no diagnosis has been made there is adequate information to conclude that a full psychiatric/psychological evaluation is indicated."  Dr. Altman further confirmed:  "If the physicians at the FAA agree with my position, I hope that their opinion will resolve this issue in your mind and we will be able to complete your evaluation."

71.     On April 28, 2014, Dr. Altman also wrote to Dr. Chesanow of the FAA, confirming the FAA's agreement to review Protack's case, confirming the issue is whether or not Delta is justified in arranging a psychiatric evaluation.

72.     Concurrently therewith, Dr. Altman provided his "primary report" consisting of hundreds of pages of documents provided by FAULKNER, PUCKETT, TERRY, MILLER, and the others involved in the witch hunt. The report states:

> No diagnosis has been made in Captain Protack's case; however, he is exhibiting a symptom which is consistent with a number of medically disqualifying diagnoses. This preliminary report provides the evidence that Captain Protack has an inability to change cognitive sets and that this issue is so extensive that he has fixed false beliefs.  Based upon this finding, I would continue to

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

recommend that he have a comprehensive psychiatric and psychological evaluation. I would request that Dr. Chesanow and Dr. Berry support the position that Captain Protack needs to have a comprehensive psychiatric and neuropsychological evaluation.

While Dr. Altman's preliminary report admitted that no diagnoses had been made, the report threatened that he would give a diagnosis "which would be a permanent bar" to Protack flying, should Protack engage in the following activities:

- He would delay the evaluation

- He would begin legal action against me. He would file a complaint with the medical board of the state of Illinois

- He would rescind the releases for the FAA. He would probably blame this action on advice from an unidentified attorney.

- He would continue to maintain that the evaluation has no legitimacy.

- He would continue to block the releases he signed during his first interview.

- In his messages he would continue to allude to upcoming legal actions.

In other words, Dr. Altman confirmed that, should Protack continue to engage in protected activity under the law, he would issue a diagnoses that would permanent bar him from flying. The report went on:

On the other hand, if he responds in the following manner, it would suggest a diagnosis which is potentially resolvable.

- Rapidly reschedule the appointments needed to complete the evaluation,. Complete all requested questionnaires and essays. Permit full contact with requested sources of information.

- Discontinue his litigious/adversarial stance.

- Take responsibility for his problematic actions.

– 21 –

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

In other words, Dr. Altman confirmed that, if Protack ceases his engagement in protected activities and submits to the psychological exam that he has been protesting, that the diagnosis from that exam *might* be resolvable, e.g., permit Protack to fly again at some point.

73.    On May 7, 2014, unrelated to the Section 15 process and Protack's alleged physical and mental disabilities as perceived by Delta, Protack's personal physician recommended Protack start taking Dymista for a chronic sinus conditions Protack suffered from.  At the time, the use of Dymista was a disqqualifying medication for pilots per the FAA.  Since Protack was still grounded by Delta and not permitted by Delta to exercise his First Class Medical Certificate as a pilot, Protack applied for long term disability benefits so, if approved, he could start taking Dymista.  Protack would not have bothered pursuing this new course of treatment but for his grounded status.

74.    On May 14, 2014, Protack sent a letter to Drs. Chesanow and Berry of the FAA responding to Dr. Altman's report, and confirming that he did file a complaint with the Illinois Department of Financial and Professional Regulation against Dr. Altman for legal and ethical compliance.  In this letter, Protack specifically confirms:  "Unfortunately, Dr. Altman interprets protecting my individual rights and asking him to follow ethical guidelines as 'litigious' and 'unusual' conduct,'" and further confirming that "Following professional legal advice is not a psychiatric condition."

75.    On May 22, 2014, Gordon Rose, Esq. of the ALPA sent a letter to PUCKETT protesting the actions of Dr. Altman, in particular that portion of the report threatening to render a diagnosis that would permanently bar Protack from aviation, should Protack continue to engage in protected activity:  "Conditioning the severity of his diagnosis on whether or not

– 22 –

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

Captain Protack 'maintain[s] that the evaluation has no legitimacy' - the very subject of the pending grievance - crosses the line of professionalism and appropriate conduct."  The ALPA further confirmed:  "Undoubtedly, a neutral would be seriously disturbed by Dr. Altman's hinging the severity of his diagnosis on whether Captain Protack stops questioning the legitimacy (reasonableness) of his being required to be subjected to a psychological evaluation, especially in light of his pending grievance on this very point."

76.    On May 28, 2014, Dr. Chesanow of the FAA referred the matter to Nicholas Lomangino, M.D., Acting Manager, Medical Specialties Division (of the FAA) requesting the FAA review the matter.  Dr. Chesanow's initial opinion was that "the current issues precipitating this evaluation are more likely employer/employee issues than aeromedically-significant psychiatric issues."

77.    The very next day, on May 29, 2014, the FAA issued Protack another First Class Medical certification, this one by Charles E. Hill, M.D.

78.    Shortly thereafter, Protack's application for long term disability benefits was approved, and Protack went on disabled status.  Rather than collecting the full pay he would and could have continued to receive while the Section 15 process was pending, Protack accepted the partial salary replacement afforded by his long term disability benefits, and began taking Dymista.  As a result of taking Dymista, Protack was disqualified from exercising his First Class Medical Certificate.  Protack intended that, once the Section 15 dispute with Delta was resolved, should his flight privileges be reinstated, he would cease using Dymista and reinstate his First Class Medical privileges, which could be accomplished quickly. On July 2, 2014, the FAA subsequently referred the matter to Debra A. Pinals, M.D. for

independent evaluation of Protack's qualifications for airman medical certification, and his fitness to pilot.

79.     On July 11, 2014, PUCKETT sent a letter to the Hartley Phinney of the ALPA, defending Dr. Altman's conduct of sending the preliminary report to Dr. Chesanow, and further demanded that Protack continue with the psychological evaluation despite the matter having been referred to the FAA. Once again, PUCKETT threatened:  "failure to comply with these simple instructions will result in disciplinary action up to and including termination."

80.     On October 9, 2014, Dr. Debra Pinals issued her "independent Psychiatric Record Review," and provided her opinion related to Protack's qualification for his airman medical certificate.  At the conclusion of her comprehensive, 21-page long report, Dr. Pinals confirms:  "In my opinion, the data available does not substantially support that Captain Protack has a condition found under the metal standards of 14 CFR Part 67 that would disqualify him from airman certification." Dr. Pinals further confirms:  "In my opinion, the records do not substantially support data that Captain Protack would be unable to identify aeronautical hazards or to appropriately process and respond to the situations based on psychiatric, mental or behavioral abnormalities."  Dr. Pinals' report further states:  "I agree with Dr. Chesanow that much of the difficulties involved in this case relate to employee/employer disagreements.  Therefore, overall the totality of the data from the records does not substantially support psychiatric, mental, or behavioral abnormalities that have a direct impact on Mr. Protack's ability to identify aeronautical hazards."  In other words, Dr. Pinals disagreed with Dr. Altman and Delta, and confirmed that Protack was fit to pilot a plane.

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

81.     On November 10, 2014, Dr. James R. Fraser, Federal Air Surgeon for the FAA again confirmed Protack's eligibility to hold the First Class Airman Medical Certificate issued on May 29, 2014, which was provided to Delta.

82.     Despite the FAA findings and rejection of Delta's attempt to medicalize the workplace dispute, Delta still did not reinstate Protack's flying privileges, and Protack remained grounded.

83.     Plaintiff moved to Long Beach, California in September 2015, as a professional option, and resided there until March 2016.  Plaintiff then moved permanently to Seal Beach, California on September 26, 2016 and has resided there ever since.   Plaintiff has a California driver's license, has paid California taxes since 2016, and is registered to vote in California.

84.     Based on his seniority, at any point until termination, Plaintiff would have been able to use his seniority rights to be reassigned to LAX as his home base, which was his intent when Plaintiff moved out to California. Based on his level of seniority versus those on the 2017 pilot seniority list for LAX, Plaintiff would have been absolutely entitled to transfer to LAX to Captain a number of planes.  If reinstated today, Plaintiff would do so.

85.     In December 2016, the new union agreement contained a provision requiring all grievances be resolved within two years.  Prior to this change, there was no time limit.  Protack, through the ALPA demanded Delta comply with this new provision and resolve his grievance over the psychiatric exam, but Delta's response was to continue to delay.

86.     On April 20, 2017, Gordon Rose, Esq. of ALPA sent a letter to PUCKETT concerning Dr. Pinals evaluation and confirmation of Protack's fitness for duty.  Mr. Rose confirmed that, under the union agreement, Dr. Pinals' report should have ended the Section 15 evaluation, quoting from the agreement that "upon the CME's determination that meets the physical

– 25 –

standards ...[he]...will be returned to flight duty."  Mr. Rose further confirmed that, since Dr. Altman/Delta had delegated the CME authority to Dr. Pinals on April 28, 2014, when Dr. Altman requested Dr. Chesanow and the FAA review Protack's case.  At the conclusion of his lengthy letter, Mr. Rose demanded Delta to confirm that the Section 15 process has been resolved with Protack found to be meeting FAA medical standards, and return to active status.

87.     On June 12, 2017, Protack sent a letter to Dr. Northrup of the FAA to file a complaint against FAULKNER.

88.     On July 6, 2017, Protack was again confirmed as eligible to hold a First Class Airman Medical Certificate, this time by Dr. Marvin Davis signing for Dr. Stephen W. Griswold.

89.     Despite the FAA's rejection of its position, and the despite the continued issuance of First Class Medical Certificates by the FAA, on July 12, 2017, PUCKETT sent a letter to Gordon Rose, Esq. of ALPA continuing to demand that Protack complete the psychiatric evaluation started by Dr. Altman, including compliance with his request for a neuropsychological examination.  Because the FAA rejected Delta's position, PUCKETT denied that it had delegated the issue to the FAA.  PUCKETT demanded Protack complete the Section 15 procedure, as it is the "exclusive procedure" for a pilot to return to work.

90.     On October 30, 2017, Protack's lawyer, Joseph Lamonica, sent a letter to Delta's Regional Director, Captain Bill Underwood, confirming that the FAA had made it clear that Protack is eligible for an unrestricted First Class Medical Certificate, which Protack will again obtain and provide to Delta. Mr. Lamonica confirmed:  "[U]nless you contact me with reasonable

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

medical objections,…Captain Protack would like to return to work, and the FAA see no impediment to doing so."

91.    On November 2, 2017, Protack filed another grievance against Delta with respect to its handling of his earlier grievance.

92.    On November 10, 2017, GRAHAM sent Protack a letter in response to the grievance, and unilaterally terminated the Section 15 medical evaluation process, claiming this act rendered moot Protack's grievance filed more than *four years* earlier and which deprived Protack of a hearing on the matter.  In his letter, GRAHAM confirms that, because the Company Medical Examiner has not rendered a medical determination that he does not meet FAA physical standards, and because he had previously presented a valid First Class Medical certificate, "Delta would consider you medically fit for duty should you present a current First Class Medical Certificate." Instead, in the very same letter, Delta now claimed that its review "revealed certain facts indicating that you engaged in a series of misrepresentations, refused to follow reasonable management directions and failed to conduct yourself and communicate in a professional and respectful manner."  Protack was ordered to report to Atlanta on November 15, 2017, for a mandatory meeting to investigate the alleged incident.  In other words, after having failed to justify and obtain the psychiatric evaluation it had been wrongfully demanding for more than four years, Delta withdrew its request for the same, and manufactured alternative reasons to keep Protack grounded.

93.    Protack did report to Atlanta on November 15, 2017, as demanded. Delta itself made arrangements for Protack to fly to/from Los Angeles to Atlanta on its planes for this meeting.  Though this meeting was supposed to be about these new reasons to discipline Protack, Delta continued to ask Protack medical questions.

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

94.    During this meeting on November 15, 2017, if Delta was not already aware, including because it flew Protack out of California for this meeting and had flown Protack from California to New York in October 2017 to attend a meeting related to Protack's Grievance, Protack expressly confirmed that he was living in California at the time.

95.    Each time Protack was commanded by Delta to report to a meeting in New York or Atlanta after having moved to California, Protack sent and received these emails while at his home in Seal Beach, California

96.    On December 13, 2017, Protack filed a complaint with the Equal Employment Opportunities Commission (the "EEOC Complaint").  The EEOC Complaint showed Protack's address in California, and was filed by Protack while Protack was a resident of California and still a Delta employee.  Concurrently with the filing of Protack's EEOC Charge, Protack was issued a Right to Sue from the Department of Fair Employment and Housing (DFEH).  This was sent to Delta with a copy of the EEOC Charge. Protack was still a Delta employee at the time.

97.    On December 20, 2017, counsel for Protack, Lee Seham, sent a letter to PUCKETT, GRAHAM, MILLER and Delta confirming that Protack had dual filed a complaint with the California DFEH and the federal EEOC concerning their unlawful harassment and retaliatory treatment of Protack, and warning them from further retaliating against Protack for this most recent protected activity.  Mr. Seham's letter recounted Delta's already long history of demanding a prohibited medical inquiry in violation of EEOC guidelines and the ADA, and retaliating against Protack for engaging in protected activity.  Plaintiff was still a Delta employee at the time, and received his copy of the letter via email at his home in Seal Beach, California.

– 28 –

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

98.     On December 26, 2017, Delta, through counsel, responded to Mr. Seham's letter, denying any wrongdoing, and denying that Delta's current investigation into Protack's alleged misconduct, constituted harassment or retaliation, and confirmed its intent to continue its retaliatory investigation. Nowhere within the letter did Mr. Wall disclaim that California laws apply, or even question why Mr. Seham would suggest California laws apply. Protack was still a Delta employee at the time, and received the email forwarding the letter while at his home in Seal Beach, California.

99.     On December 27, 2017, Mr. Seham responded to Delta's counsel's letter, "which confirms that Delta Air Lines together with Captains Graham and Miller, have chosen to prolong their threat of discipline in retaliation for what Captain Graham described as the 'manner' in which Captain Protack opposed unlawful medical inquiries and discrimination" pursuant to the ADA and the FEHA.  Mr. Seham's letter confirmed that this disciplinary investigation was further retaliation, and the conduct was itself sufficient to constitute a materially adverse action for a retaliation claim.  Mr. Seham requested immediate confirmation that the investigation of Protack would be concluded and no actions would be taken against him.  Plaintiff was still a Delta employee at the time, and received his copy of the letter via email at his home in Seal Beach, California.

100.   On January 8, 2018, Protack's attorney, Mr. Lamonica again wrote to Captain Underwood of Delta, concerning Delta's new conduct of questioning notes and documents authored by Protack's doctor, Dr. Jack Hocutt, and suggested Delta contact Dr. Hocutt directly to get confirmation of the notes that he wrote. Mr. Lamonica confirmed:  "Frankly, it defies logic that Delta has 'issues' with the authenticity of Dr. Hocutt's prescriptions notes and memos, yet never called Dr. Hocutt directly to verify same."  The doctor's

– 29 –

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

note at issue was prepared for USAA to close out the auto injury case, and submitted to Delta as verification of his medical status. USAA verified the authenticity of this note in a letter. Delta had had this same letter in its possession since July 2013.

101.   In January 2018, Protack was required to attend another meeting in Atlanta to review the findings of the company's investigation and meeting that occurred in ATL on Nov. 15th." Regional Director& Chief Pilot Captain Bill Underwood again personally arranged Plaintiff's flight from LAX in California to Atlanta, and back. In these email communications, Captain Underwood expressly confirms he understands that Plaintiff will be traveling in and out of LAX. Plaintiff sent and received these emails while at his home in Seal Beach, California.

102.   Rather than finally do the right thing, on January 22, 2018, GRAHAM issued Delta's Notice of Intent to Terminate Protack, falsely accusing him of falsifying a medical record to excuse an absence for calling in sick on *July 4, 2013*. The notice further characterizes Protack's protestation of the medical and psychological examination as being obstructionist (when it was really protected activity) and calling it misconduct, and in derogation of Delta's "highest standards of professionalism, integrity, conduct, judgment, character and trust" that Protack resisted the unlawful psychological exam. Protack received Delta's Notice of Intent to Terminate via email, while at his home in Seal Beach, California. GRAHAM'S letter also indicates that a copy of it was transmitted to MILLER, who was the presiding officer at the December 5, 2013 hearing who first demanded a psych evaluation of Plaintiff.

103.   February 2, 2018, Protack attended the "hearing" on the decision to terminate him. Delta again arranged for Protack's travel on its planes from

– 30 –

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

California to Atlanta for this purpose, exchanging emails with Protack while Protack was in California.  At the "hearing," GRAHAM asked Protack whether, if he were to be returned to service, he will have the "same interests" as before.  Protack told GRAHAM, "If you mean the Delta Pilots Association, then absolutely."  GRAHAM gave Protack a look of disgust.

104.   On February 12, 2018, GRAHAM issued to Protack Delta's Letter of Termination, based on the same reasons set forth in the January 22, 2018 Notice of Intent to Terminate.   Protack received Delta's Notice of Termination while at his home in Seal Beach, California.  As with the Notice of Intent to Terminate, GRAHAM's letter indicates that a copy of it was transmitted to MILLER, confirming that MILLER was also still participating in the harassment against Protack.

105.   This is not the first time Delta has manufactured a psychological or psychiatric issue as a pretext to ground or terminate a pilot.  At one other pilot was declared psychiatrically unstable and unfit to fly by Delta, and the pilot was forced into retirement.  The day after this pilot retired, Delta reversed the decision.  In contrast, another pilot who had been accused of falsifying a medical record to excuse an absence was not terminated, but was merely issued a Notice of Intent To Issue Letter Of Warning

106.   As previously stated, in October 2013, Delta suspended Protack's non-revenue flight privileges (the ability to fly for free on Delta aircraft , one of his benefits of employment), claiming it was due to Protack's mental condition.  Delta's claim was false and pretextual, especially since Delta had no problem flying Protack back to Atlanta on its planes to attend the various meetings with Delta that he was being forced to attend.

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

107.   At all times between September 2016 and Protack's termination date of February 12, 2018, and thereafter through the present, Protack has been a resident and citizen of the State of California.

108.   On March 21, 2018, Protack amended his EEOC Complaint to reflect that, since the filing of the original charge, Protack had since been terminated by Delta.  Like the others, this amended charge shows his address in Seal Beach, California.

109.   The Notice of Right to Sue that Protack was issued by the EEOC on July 31, 2018 also shows his address in Seal Beach, California prominently set forth thereon.

110.   Throughout the entirety of his employment, up to the date of his termination, Protack was a member of the Delta MEC Air Line Pilots Association, International, Delta's pilots' union.  The union covers the entire country, and there are branches in each of the major hub cities, including Los Angeles.  In September 2017, while still a Delta employee, Protack personally attended one of the regularly-scheduled union meetings in Los Angeles with a colleague, with the purpose of soliciting local help on his pending grievances against Delta.

111.   Plaintiff's termination was substantially motivated by Plaintiff's disability or perceived physical or mental disability and/or engagement in protected activities.  Defendants' discriminatory and retaliatory animus is evidenced by the previously mentioned facts.

112.   Since Delta never reinstated Protack's flying privileges, Protack has had no cause to stop using Dymista, and remains on disabled status.  On the date of his termination, and at all times before and thereafter, Protack was and remains a qualified individual, ready, willing and able to do the job as a pilot, should he be permitted to do so.  Protack could have and still can

– 32 –

obtain a First Class Medical Certificate at any time in short order by ceasing use of Dymista and switching to another medication.

113.   Defendants' conduct described herein was undertaken, authorized, and/or ratified  Defendants' officers, directors and/or managing agents, including, but not limited to the INDIVIDUAL DEFENDANTS, who were authorized and empowered to make decisions that reflect and/or create policy for Defendants. The aforementioned conduct of said managing agents and individuals was therefore undertaken on behalf of Defendants who further had advanced knowledge of the actions and conduct of said individuals whose actions and conduct were ratified, authorized, and approved by managing agents.

114.   As a result of Defendants' actions, Plaintiff has suffered and will continue to suffer general and special damages, including severe and profound pain and emotional distress, anxiety, depression, headaches, tension, and other physical ailments, as well as medical expenses, expenses for psychological counseling and treatment, and past and future lost wages and benefits.

115.   As a result of the above, Plaintiff is entitled to past and future lost wages, bonuses, commissions, benefits and loss or diminution of earning capacity.

116.   Plaintiff claims general damages for emotional and mental distress and aggravation in a sum in excess of the jurisdictional minimum of this Court.

117.   Because the acts taken toward Plaintiff were carried out by officers, directors and/or managing agents acting in a deliberate, cold, callous, cruel and intentional manner, in conscious disregard of Plaintiff's rights and in order to injure and damage Plaintiff, Plaintiff requests that punitive damages

– 33 –

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

be levied against Defendants and each of them, in sums in excess of the jurisdictional minimum of this Court.

## FIRST CAUSE OF ACTION

## FOR VIOLATION OF THE AMERICANS WITH DISABILITIES ACT

## 42 U.S.C. §12101 ET SEQ

## AGAINST DEFENDANT DELTA

118.   Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 102, inclusive, as though set forth in full herein.

119.   The Americans with Disabilities Act of 1990, 42 USC §12101 et seq. ("ADA"), prohibits private employers from discriminating against qualified individuals with disabilities or perceived disabilities in job application procedures, hiring, firing, advancement, compensation, job training, and other terms, conditions, and privileges of employment. The ADA covers employers with 15 or more employees, including State and local governments.

120.   Plaintiff is informed and believes and thereon alleges that Defendants are each an "employer" within the meaning of the ADA, and, employ 15 or more employees.

121.   Plaintiff is informed and believes and thereon alleges that he is a "qualified individual" within the meaning of the ADA, and Delta perceived him to be suffering physical and/or mental disabilities.  At all times relevant hereto, Plaintiff could have performed the essential functions of his job as a pilot, or another job at Delta, with or without a reasonable accommodation, including by being given a reasonable amount of time to reinstate his First Class Medical Certificate once his flying privileges were reinstated.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

122.   After years of wholly above-satisfactory, competent and diligent work performance to the significant profit of Defendants, Delta launched upon a witch hunt, based upon its purported perception that Protack had a physical disability and, later, a mental disability, that would prevent him from piloting a plane, or apparently even being a passenger in one.

123.   Over the course of more than four years, Delta repeatedly demanded a psychiatric exam that it was not entitled to and for which there was no legitimate cause to demand.

124.   These reasons offered by Defendants were, in part, a pretext designed to conceal Defendants' practice of discriminating against Pilots, including Protack, on the basis of physical or mental disability.

125.   Although Protack was not offered any alternative positions for which he was qualified and which did not include actual piloting of a plane, employees without a physical or mental disability and with less experience than Protack, upon information and belief, were retained or hired into in these alternative positions.

126.   Protack believes and thereon alleges that his physical or mental disability, as perceived by Defendant, was a factor in Defendants' decision to remove him from active status, demand a psychiatric exam, and terminate him, as well as to deny him reinstatement or to hire him into the positions to which he was qualified after having been terminated.  Such discrimination was in violation of the ADA and resulted in damage and injury to Protack as alleged herein.

127.   As a direct result of Defendants' actions and failures to act, Defendants violated 42 USC §12112(a) of the ADA, which provides:

> No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or

– 35 –

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

128. As a direct result of Defendants' actions and failures to act, Defendants violated 42 USC §12112(d)(1) of the ADA, which provides:

The prohibition against discrimination as referred to in subsection (a) of this section shall include medical examinations and inquiries.

129. As a direct result of Defendants' actions and failures to act, Defendants violated 42 USC §12112(d)(4)(A) of the ADA, which provides

Prohibited examinations and inquiries

A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity.

130. As a direct result of Defendants' actions and failures to act, Defendants violated 42 USC §12112(b)(5)(A) of the ADA, which provides

As used in subsection (a) of this section, the term "discriminate against a qualified individual on the basis of disability" includes--

…

not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity…

131. Defendants' failure to supervise, control, direct, manage, and counsel those agents throughout Plaintiff's employment, including the INDIVIDUAL DEFENDANTS named herein, ratified, condoned and/or encouraged the discriminatory behavior and enabled agents to believe that their conduct was appropriate.

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

132.   Upon information and belief, Defendants have a systemic and wide-spread policy of discriminating against and retaliating against employees with real or perceived disabilities.  By failing to stop the discrimination, harassment and retaliation, the Defendants ratified the harassing, discriminatory and retaliatory conduct which, in turn, directly caused a vicious cycle allowing Plaintiff's coworkers, supervisors, and other staff, including the INDIVIDUAL DEFENDANTS, to act discriminatorily toward Plaintiff with impunity.

133.   Upon information and belief, Protack was replaced by Defendants with someone not suffering from a mental, physical or medical disability or condition.

134.   The ADA makes it unlawful for an employer to discriminate against an employee on the basis of the employee's physical or mental disability or medical condition.

135.   Defendants engaged in unlawful employment practices in violation of ADA by failing to investigate Plaintiff's complaints, having and enforcing rules that are discriminatory on their face, and for promoting and adopting conduct that violates federal law.  In addition, Defendants had a policy of retaliation, and did retaliate, against employees that complained about unequal and discriminatory treatment in a direct effort to stifle such exercise of rights.

136.   Plaintiff submits that his physical and/or mental disability as perceived by Defendants was a motivating factor in the decision of Defendants to mistreat him, discriminate against him, allow him to be harassed, deny him equal access to opportunities to further his career, deny him the ability to fairly compete with his co-workers, further deny him opportunities extended to counterparts without disabilities or medical

– 37 –

conditions, ultimately terminate his employment, and other discrimination against him, in violation of the ADA.

137.   Said conduct violates the ADA, and such violations were a proximate cause in Plaintiff's damage as stated below.

138.   The damage allegations of Paragraphs 113 through 116, inclusive, are herein incorporated by reference.

139.   The foregoing conduct of Defendants individually, or by and through their officers, directors and/or managing agents, was intended by the Defendants to cause injury to the Plaintiff or was despicable conduct carried on by the Defendants with a willful and conscious disregard of the rights of Plaintiff or subjected Plaintiff to cruel and unjust hardship in conscious disregard of Plaintiff's rights such as to constitute malice, oppression, or fraud under the ADA and Civil Code §3294, thereby entitling Plaintiff to punitive damages in an amount appropriate to punish or make an example of Defendants.

140.   Pursuant to 42 U.S.C. § 12117 and 42 U.S.C. § 2000e-5(k), or any other statutory basis, Plaintiff requests a reasonable award of attorneys' fees and costs.

## SECOND CAUSE OF ACTION
## FOR VIOLATIONS OF RAILWAY LABOR ACT (RLA)
## 45 U.S.C. §151, ET SEQ
## AGAINST DEFENDANT DELTA

141.   Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 155, inclusive, as though set forth in full herein.

142.   45 U.S.C. § 152, Fourth, provides:

> Employees shall have the right to organize and bargain collectively through representatives of their own choosing.... No carrier, its officers or agents, shall deny

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

> or in any way question the right of its employees to join, organize, or assist in organizing the labor organization of their choice, and it shall be unlawful for any carrier to interfere in any way with the organization of its employees ... or to influence or coerce employees in an effort to induce them to join or remain or not to join or remain members of any labor organization....

143.  Protack engaged in protected union activities, as he was an active participant in the movement to replace ALPA with a new union, the DPA, and regularly exercised his rights under the union agreement to grieve Delta's adverse actions taken against him.

144.  Delta knew that Protack was engaged in protected union activities, including his active efforts to establish the DPA, and even expressly brought up these activities during the termination "hearing."

145.  Defendants engaged in unlawful employment practices in violation of the RLA, as more fully alleged above, and by failing to investigate Plaintiff's complaints, having and enforcing rules that are discriminatory and/or retaliatory on their face, and for promoting and adopting conduct that violates federal law.  In addition, Defendants had a policy of retaliation, and did retaliate, against employees that engaged in union organizing activities in a direct effort to stifle such exercise of rights.

146.  Plaintiff submits that his union activities were a motivating factor in the decision of Defendants to mistreat him, discriminate against him, allow him to be harassed, deny him equal access to opportunities to further his career, deny him the ability to fairly compete with his co-workers, ultimately terminate his employment, and other retaliation against him, in violation of the RLA.

147.  Said conduct violates RLA, and such violations were a proximate cause in Plaintiff's damage as stated below.

148.   The damage allegations of Paragraphs 113 through 116, inclusive, are herein incorporated by reference.

149.   The foregoing conduct of Defendants individually, or by and through their officers, directors and/or managing agents, was intended by the Defendants to cause injury to the Plaintiff or was despicable conduct carried on by the Defendants with a willful and conscious disregard of the rights of Plaintiff or subjected Plaintiff to cruel and unjust hardship in conscious disregard of Plaintiff's rights such as to constitute malice, oppression, or fraud under the RLA and Civil Code §3294, thereby entitling Plaintiff to punitive damages in an amount appropriate to punish or make an example of Defendants.

150.   Plaintiff requests a reasonable award of attorneys' fees and costs.

## THIRD CAUSE OF ACTION

## FOR DISCRIMINATION IN VIOLATION OF CAL. GOV'T CODE §§12940 ET SEQ.

## AGAINST DEFENDANT DELTA

151.   Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 165, inclusive, as though set forth in full herein.

152.   At all times hereto, the FEHA was in full force and effect and was binding upon Defendants and each of them.

153.   As such term is used under FEHA, "on the bases enumerated in this part" means or refers to discrimination on the bases of one or more of the protected characteristics under FEHA.

154.   FEHA requires Defendants to refrain from discriminating against an employee on the basis of disability and/or medical condition, real or perceived, and to prevent discrimination and harassment on the basis of

disability and/or medical condition, real or perceived, and engagement in protected activities from occurring.

155. Plaintiff was a member of multiple protected classes as a result of Plaintiff's disability, medical condition and/or the perception that Plaintiff was suffering from a disability and/or medical condition.

156. At all times relevant hereto, Plaintiff was performing competently in the position Plaintiff held with Defendants. Plaintiff was a qualified individual because he could have performed the essential functions of his job as a pilot, or another job at Delta, with or without a reasonable accommodation, including by being given a reasonable amount of time to reinstate his First Class Medical Certificate once his flying privileges were reinstated.

157. Plaintiff suffered the adverse employment actions of unlawful harassment, discrimination, failure to investigate, remedy, and/or prevent discrimination, failure to reinstate and/or return to work, and termination, and was harmed thereby.

158. Plaintiff is informed and believes that Plaintiff's disability and/or medical condition, real and perceived, and/or some combination of these protected characteristics under California Government Code §12926(j) were motivating reasons and/or factors in the decisions to subject Plaintiff to the aforementioned adverse employment actions.

159. Said conduct violates the FEHA, and such violations were a proximate cause in Plaintiff's damage as stated below.

160. Defendants' unlawful employment practices were committed both where the employment decision is made and where its effects are felt. Commencing in September 2015, the effects of Defendants' unlawful employment practices, including the ongoing adverse employment actions of failure to reinstate and/or return to work, and termination, were felt by

– 41 –

Plaintiff in California.  Further, Plaintiff would have worked in California but for Defendants' unlawful practices, because had Plaintiff's flying privileges ever been restored, Plaintiff would have used his seniority rights, as a matter of right, to be based out of California.

161.   The damage allegations of Paragraphs 113 through 116, inclusive, are herein incorporated by reference.

162.   The foregoing conduct of Defendants individually, or by and through their officers, directors and/or managing agents, was intended by the Defendants to cause injury to the Plaintiff or was despicable conduct carried on by the Defendants with a willful and conscious disregard of the rights of Plaintiff or subjected Plaintiff to cruel and unjust hardship in conscious disregard of Plaintiff's rights such as to constitute malice, oppression, or fraud under Civil Code §3294, thereby entitling Plaintiff to punitive damages in an amount appropriate to punish or make an example of Defendants.

163.   Pursuant to California Government Code §12965(b), Plaintiff requests a reasonable award of attorneys' fees and costs, including expert fees pursuant to the FEHA.

## FOURTH CAUSE OF ACTION

## FOR HARASSMENT IN VIOLATION OF CAL. GOV'T CODE §§12940 ET SEQ.

## AGAINST ALL DEFENDANTS

164.   Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 177, inclusive, as though set forth in full herein.

165.   At all times hereto, the FEHA was in full force and effect and was binding upon Defendants and each of them.  California Government Code §1940(j)(1) prohibits harassment on the basis of physical or mental disability, real or perceived, and other protected classifications. "It shall be

– 42 –

an unlawful employment practice ... [f]or an employer ... or any other person, because of ... physical disability, mental disability, ... to harass an employee.... Harassment of an employee ... by an employee other than an agent or supervisor shall be unlawful if the entity, or its agents or supervisors, knows or should have known of this conduct and fails to take immediate and appropriate corrective action. An entity shall take all reasonable steps to prevent harassment from occurring."

166.   The FEHA, in particular  California Government Code §1940(i), makes it unlawful "[f]or any person to aid, abet, incite, compel, or coerce the doing of any of the acts forbidden under this part, or to attempt to do so."

167.   These laws set forth in the preceding paragraph require Defendants to refrain from harassing, or creating, or maintaining a hostile work environment against an employee based upon the employee's disability and/or medical condition, real or perceived, and engagement in protected activities, as set forth hereinabove.  These laws hold each participant in the harassing conduct individually liable for the entirety of the harassment.

168.   Defendants' harassing conduct was severe or pervasive, was unwelcome by Plaintiff, and a reasonable person in Plaintiff's circumstances would have considered the work environment to be hostile or abusive.

169.   By its nature, because it requires a victim, harassment is committed where its effects are felt.  Commencing in September 2015, the effects of Defendants' harassment were felt by Plaintiff in California.  Further, Plaintiff would have worked in California but for Defendants' unlawful practices, because had Plaintiff's flying privileges ever been restored,

– 43 –

Plaintiff would have used his seniority rights, as a matter of right, to be based out of California.

170.   Defendants violated the FEHA and the public policy of the State of California which is embodied in the FEHA by creating a hostile work environment and harassing Plaintiff because of Plaintiff's disability, real or perceived, engagement in protected activities, and/or some combination of these protected characteristics, as set forth hereinabove.

171.   The above said acts were perpetrated upon Plaintiff by a supervisor, and/or Defendants knew or should have known of the conduct but failed to take immediate and appropriate corrective action.

172.   The above said acts of Defendants constitute violations of the FEHA and violations of the public policy of the State of California.  Such violations were a proximate cause in Plaintiff's damage as stated below.

173.   The damage allegations of Paragraphs 113 through 116, inclusive, are herein incorporated by reference.

174.   The foregoing conduct of Defendants individually, or by and through their officers, directors and/or managing agents, was intended by the Defendants to cause injury to the Plaintiff or was despicable conduct carried on by the Defendants with a willful and conscious disregard of the rights of Plaintiff or subjected Plaintiff to cruel and unjust hardship in conscious disregard of Plaintiff's rights such as to constitute malice, oppression, or fraud under California Civil Code §3294, thereby entitling Plaintiff to punitive damages in an amount appropriate to punish or make an example of Defendants.

175.   Pursuant to California Government Code §12965(b), Plaintiff requests a reasonable award of attorneys' fees and costs, including expert fees pursuant to the FEHA.

– 44 –

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

## FIFTH CAUSE OF ACTION

## FOR RETALIATION IN VIOLATION OF CAL. GOV'T CODE §§12940 ET SEQ.

## AGAINST DEFENDANT DELTA

176.   Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 188, inclusive, as though set forth in full herein.

177.   At all times hereto, the FEHA was in full force and effect and was binding upon Defendants and each of them.

178.   These laws set forth in the preceding paragraph require Defendants to refrain from retaliating against an employee for engaging in protected activity.

179.   Plaintiff engaged in the protected activities of refusing to submit to an unwarranted psychological examination, protesting Defendants' attempts to force him to take an unwarranted psychological examination, filing grievances relating to the unwarranted psychological examination, filing complaints with the DFEH and EEOC, retaining counsel and protesting Defendants' perceived violations of State and Federal laws, including the FEHA and ADA, and complaining about and protesting Defendants' discriminatory and harassing conduct towards Plaintiff based upon Plaintiff's disability, real or perceived.

180.   Commencing in September 2015, nearly all of Plaintiff's protected activities occurred in California including, without limitation, the filing of his DFEH and EEOC complaints and complaints of Defendants' violations of California and Federal laws.

181.   Plaintiff suffered the adverse employment actions of unlawful harassment, discrimination, failure to investigate, remedy, and/or prevent

– 45 –

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

discrimination, failure to reinstate and/or return to work, and termination, and was harmed thereby.

182.   Plaintiff is informed and believes that Plaintiff's conduct of refusing to submit to an unwarranted psychological examination, protesting Defendants' attempts to force him to take an unwarranted psychological examination, filing grievances relating to the unwarranted psychological examination, filing complaints with the DFEH and EEOC, retaining counsel and protesting Defendants' perceived violations of State and Federal laws, including the FEHA and ADA, and complaining about and protesting Defendants' discriminatory and harassing conduct towards Plaintiff based upon Plaintiff's disability, real or perceived, and/or some combination of these factors, were motivating reasons and/or factors in the decisions to subject Plaintiff to the aforementioned adverse employment actions.

183.   Defendants' unlawful employment practices were committed both where the employment decision is made and where its effects are felt. Commencing in September 2015, the effects of Defendants' unlawful employment practices, including the ongoing adverse employment actions of failure to reinstate and/or return to work, and termination, were felt by Plaintiff in California.  Further, Plaintiff would have worked in California but for Defendants' unlawful practices, because had Plaintiff's flying privileges ever been restored, Plaintiff would have used his seniority rights, as a matter of right, to be based out of California.

184.   Defendants violated the FEHA by retaliating against Plaintiff and terminating Plaintiff for attempting to exercise Plaintiff's protected rights, as set forth hereinabove.

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

185.   Plaintiff is informed and believes, and based thereon alleges, that the above acts of retaliation committed by Defendants were done with the knowledge, consent, and/or ratification of, or at the direction of, each other Defendant and the other Managers.

186.   The above said acts of Defendants constitute violations of the FEHA, and were a proximate cause in Plaintiff's damage as stated below.

187.   The damage allegations of Paragraphs 113 through 116, inclusive, are herein incorporated by reference.

188.   The foregoing conduct of Defendants individually, or by and through their officers, directors and/or managing agents, was intended by the Defendants to cause injury to the Plaintiff or was despicable conduct carried on by the Defendants with a willful and conscious disregard of the rights of Plaintiff or subjected Plaintiff to cruel and unjust hardship in conscious disregard of Plaintiff's rights such as to constitute malice, oppression, or fraud under California Civil Code §3294, thereby entitling Plaintiff to punitive damages in an amount appropriate to punish or make an example of Defendants.

189.   Pursuant to California Government Code §12965(b), Plaintiff requests a reasonable award of attorneys' fees and costs, including expert fees pursuant to the FEHA.

///
///
///
///
///
///

– 47 –

# SIXTH CAUSE OF ACTION
## FAILURE TO PREVENT DISCRIMINATION, HARASSMENT, AND RETALIATION
### IN VIOLATION OF CAL. GOV'T CODE §12940(k)
### AGAINST DEFENDANT DELTA

190.  Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 200, inclusive, as though set forth in full herein.

191.  At all times hereto, the FEHA, including in particular California Government Code §12940(k), was in full force and effect and was binding upon Defendants.  This subsection imposes a duty on Defendants to take all reasonable steps necessary to prevent discrimination, harassment, and retaliation from occurring.  As alleged above, Defendants violated this subsection and breached their duty by failing to take all reasonable steps necessary to prevent discrimination, harassment, and retaliation from occurring.

192.  The above said acts of Defendants constitute violations of the FEHA, and were a proximate cause in Plaintiff's damage as stated below.

193.  The damage allegations of Paragraphs 113 through 116, inclusive, are herein incorporated by reference.

194.  The foregoing conduct of Defendants individually, or by and through their officers, directors and/or managing agents, was intended by the Defendants to cause injury to the Plaintiff or was despicable conduct carried on by the Defendants with a willful and conscious disregard of the rights of Plaintiff or subjected Plaintiff to cruel and unjust hardship in conscious disregard of Plaintiff's rights such as to constitute malice, oppression, or fraud under California Civil Code §3294, thereby entitling

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

Plaintiff to punitive damages in an amount appropriate to punish or make an example of Defendants.

195.   Pursuant to California Government Code §12965(b), Plaintiff requests a reasonable award of attorneys' fees and costs, including expert fees pursuant to the FEHA.

**SEVENTH CAUSE OF ACTION**

**FOR DECLARATORY JUDGMENT**

**AGAINST ALL DEFENDANTS**

196.   Plaintiff re-alleges and incorporates by reference paragraphs 1 through 190, inclusive, as though set forth in full herein.

197.   California Government Code §12920 sets forth the public policy of the State of California as follows:

> It is hereby declared as the public policy of this state that it is necessary to protect and safeguard the right and opportunity of all persons to seek, obtain, and hold employment without discrimination or abridgment on account of race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, genetic information, marital status, sex, gender, gender identity, gender expression, age, or sexual orientation.

> It is recognized that the practice of denying employment opportunity and discriminating in the terms of employment for these reasons foments domestic strife and unrest, deprives the state of the fullest utilization of its capacities for development and advancement, and substantially and adversely affects the interests of employees, employers, and the public in general.

> Further, the practice of discrimination because of race, color, religion, sex, gender, gender identity, gender expression, sexual orientation, marital status, national origin, ancestry, familial status, source of income, disability, or genetic information in housing accommodations is declared to be against public policy.

> It is the purpose of this part to provide effective remedies that will eliminate these discriminatory practices.

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

> This part shall be deemed an exercise of the police power of the state for the protection of the welfare, health, and peace of the people of this state.

198.   California Government Code §12920.5 embodies the intent of the California legislature and states:

> In order to eliminate discrimination, it is necessary to provide effective remedies that will both prevent and deter unlawful employment practices and redress the adverse effects of those practices on aggrieved persons. To that end, this part shall be deemed an exercise of the Legislature's authority pursuant to Section 1 of Article XIV of the California Constitution.

199.   Moreover, California Government Code §12921, subdivision (a) says in pertinent part:

> The opportunity to seek, obtain, and hold employment without discrimination because of race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, genetic information, marital status, sex, gender, gender identity, gender expression, age, or sexual orientation is hereby recognized as and declared to be a civil right.

200.   42 U.S.C. § 2000e-5 similarly provides for declaratory judgment under the ADA for violations or threatened violations of its provisions.

201.   An actual controversy has arisen and now exists between Plaintiff and Defendants concerning their respective rights and duties as it is believed that Defendants may allege that they did not discriminate, harass and/or retaliate against Plaintiff; that Plaintiff was not terminated as a result of Plaintiff's actual or perceived disability, engagement in protected activities, and/or some combination of these protected characteristics. Plaintiff contends that Defendants did discriminate, harass, and retaliate against Plaintiff on the basis of Plaintiff's disability and/or perceived disability, engagement in protected activities, and/or some combination of these protected characteristics; and that Plaintiff was retaliated against and,

– 50 –

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

ultimately wrongfully terminated as a result of Plaintiff's disability and/or perceived disability, engagement in protected activities, and/or some combination of these protected characteristics.  Plaintiff is informed and believes, and on that basis alleges, that Defendants shall dispute Plaintiff's contentions.

202.   Pursuant to California Code of Civil Procedure §1060 and 28 U.S.C. §§ 2201 and 2202, Plaintiff desires a judicial determination of Plaintiff's rights and duties, and a declaration that Defendants harassed Plaintiff on the basis of Plaintiff's actual or perceived disability, engagement in protected activities, and/or some combination of these protected characteristics.

203.   Pursuant to California Code of Civil Procedure §1060 and 28 U.S.C. §§ 2201 and 2202, Plaintiff seeks a judicial determination of Plaintiff's rights and duties, and a declaration that Plaintiff's actual or perceived disability, engagement in protected activities, and/or some combination of these protected characteristics was a substantial motivating factor in the decision to subject Plaintiff to the aforementioned adverse employment actions.

204.   A judicial declaration is necessary and appropriate at this time under the circumstances in order that Plaintiff, for Plaintiff and on behalf of employees in the State of California and/or the United States of America, and in conformity with the public policy of the State and the Country, obtain a judicial declaration of the wrongdoing of Defendants and to condemn such discriminatory employment policies or practices prospectively. *Harris v. City of Santa Monica* (2013) 56 Cal.4th 203.

205.   A judicial declaration is necessary and appropriate at this time such that Defendants may also be aware of their obligations under the law to not

– 51 –

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

engage in discriminatory practices and to not violate the law in the future, and to compel reinstate of Plaintiff to his former position, and without the threat of these discriminatory practices moving forward.

206.   California Government Code §12965(b) provides that an aggrieved party, such as the Plaintiff herein, may be awarded reasonable attorney's fees and costs: "In civil actions brought under this section, the court, in its discretion, may award to the prevailing party, including the department, reasonable attorney's fees and costs, including expert witness fees." Such fees and costs expended by an aggrieved party may be awarded for the purpose of redressing, preventing, or deterring discrimination and harassment.

## EIGHTH CAUSE OF ACTION
## FOR RETALIATION
## IN VIOLATION OF CAL. LABOR CODE §§ 1102.5 AND 1102.6
## AGAINST DEFENDANT DELTA

207.   Plaintiff re-alleges and incorporates by reference all Paragraphs, inclusive, as though set forth in full herein.

208.   At all relevant times, California Labor Code §1102.5(a) was in full force and effect, and was binding on Defendants.  This law prohibits an employer, or any person acting on behalf of the employer, from discharging an employee or in any manner discriminating or retaliating against, or taking any adverse action against, an employee because, among other things, the employee disclosed information to a government or law enforcement agency, or to a person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation or noncompliance, if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute,

– 52 –

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

or violation of or noncompliance with a local, state, or federal rule or regulation, regardless of whether disclosing the information is part of the employee's job duties.  Pursuant to California Labor Code §1102.5(f), in addition to other penalties, an employer that is a corporation or limited liability company is liable for a civil penalty not exceeding ten thousand dollars ($10,000) for each violation of this section.

209.   As alleged herein, Plaintiff reported suspected violations of the law, in particular, the ADA, the FEHA, and other laws, to Plaintiff's supervisors at Delta, including the INDIVIDUAL DEFENDANTS. Plaintiff further reported Defendants' suspected violations of the law to the medical boards of the States of Illinois and Georgia, as well as to the DFEH and the EEOC.  Commencing in September 2015, Plaintiff's reports occurred in California, from California, and/or while Plaintiff was residing in California.

210.   Defendants subjected Plaintiff to the adverse employment action, including without limitation, termination because Plaintiff reported the suspected violations of the law.

211.   Plaintiff's reports of these violations were a motivating and contributing factor for the adverse employment actions by Defendants against Plaintiff.

212.   Defendants' unlawful employment practices were committed both where the employment decision is made and where its effects are felt. Commencing in September 2015, the effects of Defendants' unlawful employment practices, including the ongoing adverse employment actions of failure to reinstate and/or return to work, and termination, were felt by Plaintiff in California.  Further, Plaintiff would have worked in California but for Defendants' unlawful practices, because had Plaintiff's flying

– 53 –

privileges ever been restored, Plaintiff would have used his seniority rights, as a matter of right, to be based out of California.

213.  Said conduct violates Labor Code Labor Code §1102.5 and Labor Code §1102.6, and such violations were a proximate cause in Plaintiff's damages as hereinabove stated.

214.  The damage allegations of Paragraphs 113 through 116, inclusive, are herein incorporated by reference.

215.  As a result of Defendants' actions, Plaintiff is entitled to a civil penalty not to exceed $10,000.00 for Defendants' violations of California Labor Code § 1102.5.

216.  The foregoing conduct of Defendants individually, or by and through their managing agents, was intended by Defendants to cause injury to Plaintiff, or was despicable conduct carried on by Defendants with a willful and conscious disregard of the rights of Plaintiff or subjected Plaintiff to cruel and unjust hardship in conscious disregard of Plaintiff's rights such as to constitute malice, oppression, or fraud under California Civil Code §3294, thereby entitling Plaintiff to punitive damages in an amount appropriate to punish or make an example of Defendants.

## NINTH CAUSE OF ACTION
## FOR UNFAIR COMPETITION
## CAL. BUSINESS & PROFESSIONS CODE §§17200, ET SEQ.
## AGAINST DEFENDANT DELTA

217.  Plaintiff re-alleges and incorporates by reference each of the foregoing paragraphs as though set forth in full herein.

218.  Defendants' violations of the ADA, RLA, the FEHA, and Labor Code §1102.5 constitute unfair business practices in violation of California Business & Professions Code §§17200, et seq.

– 54 –

219.   As a result of Defendants' unfair business practices, Defendants have reaped unfair benefits and illegal profits at the expense of Plaintiff and members of the public.  Defendants should be made to disgorge their ill-gotten gains and restore such monies to Plaintiff.

220.   Defendants' unfair business practices entitle Plaintiff to seek preliminary and permanent injunctive relief, including but not limited to orders that the Defendants account for, disgorge, and restore to the Plaintiff the unpaid compensation and other monies and benefits unlawfully withheld from Plaintiff, and to restore Plaintiff to his former position with Defendants.

**TENTH CAUSE OF ACTION**
**FOR WRONGFUL TERMINATION**
**IN VIOLATION OF PUBLIC POLICY**
**AGAINST DEFENDANT DELTA**

221.   Plaintiff re-alleges and incorporates by reference each of the foregoing paragraphs as though set forth in full herein.

222.   At all relevant times mentioned in this complaint, the ADA, ADEA, and Title VII were in full force and effect and were binding on Defendants.  These laws require Defendants to refrain, among other things, from discriminating against any employee on the basis of actual or perceived disability, and from retaliating against any employee who engages in protected activity.

223.   At all relevant times mentioned in this complaint, the FEHA was in full force and effect, and was binding on Defendants.  This law requires Defendants to refrain, among other things, from discriminating against any employee on the basis of actual or perceived disability, and from retaliating against any employee who engages in protected activity.

– 55 –

224. At all times mentioned in this complaint, it was a fundamental policy of the United States of America and the State of California that Defendants cannot discriminate and/or retaliate against any employee on the basis of actual or perceived disability, and/or engagement in protected activity.

225. Plaintiff believes and thereon alleges that Plaintiff's disability and/or medical condition, real or perceived, engagement in protected activity with respect to these protected classes, and/or some combination thereof, were factors in Defendants' conduct as alleged hereinabove.

226. At all relevant times mentioned in this complaint, the RLA, National Labor Relations Act (29 U.S.C. § 1538(a)) and California Labor Code §§ 922-923 were in full force and effect, and were binding on Defendants. These laws require Defendants to refrain, among other things, from retaliating against and/or interfering with an employee's right to engage in union-related activities.

227. At all times mentioned in this complaint, it was a fundamental policy of the United States of America and the State of California that Defendants cannot retaliate against any employee on the basis of union-related activities.

228. At all relevant times mentioned in this complaint, California Labor Code §1102.5 was in full force and effect and was binding upon Defendants and each of them. This law prohibits retaliation against employees who disclose reasonable suspicions of illegal activity or conduct by their employer to a government or law enforcement agency, or to employer itself. California Labor Code §1102.5 reflects the California's broad public policy interest in encouraging workplace "whistleblowers," who may without fear of retaliation report concerns

– 56 –

regarding an employer's suspected illegal conduct, irrespective of whether the reporting is made to governmental agencies or to the employer itself, and irrespective of whether the employee's suspicions are correct that the challenged conduct actually violates some law.  Indeed, the law in California is that an employee's good faith but mistaken belief in the illegality of his co-workers', supervisor's, and employer's conduct is protected from employer retaliation in the whistle-blowing context.

229.   Such discrimination and retaliation, resulting in the wrongful termination of Plaintiff's employment on the basis of actual or perceived disability, Plaintiff's complaining of harassment and discrimination due to these protected classes, Plaintiff's engagement in protected activity under the FEHA, ADA, and/or California Labor Code §1102.5, Plaintiff's engagement in union activities, and/or some combination of these factors, were a proximate cause in Plaintiff's damages as stated below.

230.   The above said acts of Defendants constitute violations of Federal law, the Government Code, the Labor Code, and the public policies of the United States of America and the State of California embodied therein as set forth above.  Defendants violated these laws by discriminating and retaliating against Plaintiff ,and terminating Plaintiff's employment in retaliation for exercise of protected rights.

231.   The damage allegations of Paragraphs 113 through 116, inclusive, are herein incorporated by reference.

232.   The foregoing conduct of Defendants individually, or by and through their officers, directors and/or managing agents, was intended by the Defendants to cause injury to the Plaintiff or was despicable conduct carried on by the Defendants with a willful and conscious disregard of the rights of Plaintiff or subjected Plaintiff to cruel and unjust hardship in

– 57 –

conscious disregard of Plaintiff's rights such as to constitute malice, oppression, or fraud under federal laws and California Civil Code §3294, thereby entitling Plaintiff to punitive damages in an amount appropriate to punish or make an example of Defendants.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff seeks judgment against Defendants and each of them, as follows:

1. For a money judgment representing compensatory damages including lost wages, earnings, commissions, retirement benefits, and other employee benefits, and all other sums of money, together with interest on these amounts; for other special damages; and for general damages for mental pain and anguish and emotional distress and loss of earning capacity;

2. For civil penalties pursuant to California Labor Code § 1102.5 in the amount of no less than $10,000.00;

3. For prejudgment interest on each of the foregoing at the legal rate from the date the obligation became due through the date of judgment in this matter.

**WHEREFORE**, Plaintiff further seeks judgment against Defendants, and each of them, in an amount according to proof, as follows:

4. For a declaratory judgment reaffirming Plaintiff's equal standing under the law and condemning Defendants' discriminatory practices;

5. For injunctive relief barring Defendants' discriminatory and retaliatory employment policies and practices in the future, and restoring Plaintiff to Plaintiff's former position with Defendants;

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

6.      For punitive damages, pursuant to federal laws and California Civil Code §3294 in  amounts sufficient to punish Defendants for the wrongful conduct alleged herein and to deter such conduct in the future;

7.      For costs of suit, attorneys' fees, and expert witness fees pursuant to 42 USC ' 12117, the ADA, RLA, FEHA, Labor Code and/or any other basis;

8.      For post-judgment interest; and

9.      For any other relief that is just and proper.

ADDITIONALLY, the amount demanded exceeds $25,000.00 (Cal. Govt. Code § 72055).

Respectfully submitted this ___ day of January, 2021.


_____
MICHAEL PROTACK

Address:  P.O. Box 112
Seal Beach, CA  90740

Telephone: (302) 690-8872


## **JURY TRIAL DEMANDED**

Plaintiff demands trial of all issues by jury.


Respectfully submitted this ____ day of January, 2021.


_____
MICHAEL PROTACK

Address:  P.O. Box 112
Seal Beach, CA  90740

Telephone: (302) 690-8872

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

COX, WOOTTON, LERNER, GRIFFIN & HANSEN, LLP

DUANE R. MIYASHIRO          6513
   Email:  dmiyashiro@cwlfirm.com
JAMIE C. S. MADRIAGA          9769
   Email:  jmadriaga@cwlfirm.com
841 Bishop Street, Suite 1099
Honolulu, Hawai'i 96813
Phone: (808) 744-7020
Fax: (808) 354-0427

Attorneys for Defendants
TEVA PHARMACEUTICALS USA, INC., TEVA
WOMEN'S HEALTH, INC., TEVA WOMEN'S
HEALTH, LLC, THE COOPER COMPANIES, INC.,
AND COOPERSURGICAL, INC.

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| JONELLE KIRKPATRICK,<br><br>              Plaintiff,<br><br>      vs.<br><br>TEVA PHARMACEUTICALS USA,<br>INC.; TEVA WOMEN'S HEALTH,<br>INC. d/b/a TEVA WOMEN'S<br>HEALTH, LLC; TEVA WOMEN'S<br>HEALTH, LLC; THE COOPER<br>COMPANIES, INC.; and<br>COOPERSURGICAL, INC.,<br><br>              Defendants. | Case 1:20-cv-00444-DKW-KJM<br><br>**NOTICE OF APPEARANCE OF<br>COUNSEL**; CERTIFICATE OF<br>SERVICE |

## <u>NOTICE OF APPEARANCE OF COUNSEL</u>

DUANE R. MIYASHIRO of the law firm of Cox, Wootton, Lerner, Griffin

& Hansen, LLP, hereby gives notice of his appearance as counsel for Defendants

(1) TEVA PHARMACEUTICALS USA, INC.; (2) TEVA WOMEN'S HEALTH,

INC.; (3) TEVA WOMEN'S HEALTH, LLC; (4) THE COOPER COMPANIES,

INC.; and (5) COOPERSURGICAL, INC., in the above referenced action.

DATED: Honolulu, Hawai'i, November 5, 2020.

/s/ Duane R. Miyashiro
DUANE R. MIYASHIRO
JAMIE C. S. MADRIAGA
Attorneys for Defendants
TEVA PHARMACEUTICALS USA,
INC., TEVA WOMEN'S HEALTH,
INC., TEVA WOMEN'S HEALTH,
LLC, THE COOPER COMPANIES,
INC., AND COOPERSURGICAL, INC.

2

COX, WOOTTON, LERNER, GRIFFIN & HANSEN, LLP

DUANE R. MIYASHIRO        6513
  Email:  dmiyashiro@cwlfirm.com
JAMIE C. S. MADRIAGA        9769
  Email:  jmadriaga@cwlfirm.com
841 Bishop Street, Suite 1099
Honolulu, Hawai'i 96813
Phone: (808) 744-7020
Fax: (808) 354-0427

Attorneys for Defendants
TEVA PHARMACEUTICALS USA, INC., TEVA
WOMEN'S HEALTH, INC., TEVA WOMEN'S
HEALTH, LLC, THE COOPER COMPANIES, INC.,
AND COOPERSURGICAL, INC.

## IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| JONELLE KIRKPATRICK,<br><br>           Plaintiff,<br><br>     vs.<br><br>TEVA PHARMACEUTICALS USA,<br>INC.; TEVA WOMEN'S HEALTH,<br>INC. d/b/a TEVA WOMEN'S<br>HEALTH, LLC; TEVA WOMEN'S<br>HEALTH, LLC; THE COOPER<br>COMPANIES, INC.; and<br>COOPERSURGICAL, INC.,<br><br>           Defendants. | Case 1:20-cv-00444-DKW-KJM<br><br>**NOTICE OF APPEARANCE OF**<br>**COUNSEL**; CERTIFICATE OF<br>SERVICE |

## <u>NOTICE OF APPEARANCE OF COUNSEL</u>

JAMIE C. S. MADRIAGA of the law firm of Cox, Wootton, Lerner, Griffin

& Hansen, LLP, hereby gives notice of her appearance as counsel for Defendants

(1) TEVA PHARMACEUTICALS USA, INC.; (2) TEVA WOMEN'S HEALTH,

INC.; (3) TEVA WOMEN'S HEALTH, LLC; (4) THE COOPER COMPANIES,

INC.; and (5) COOPERSURGICAL, INC., in the above referenced action.

DATED: Honolulu, Hawai'i, November 5, 2020.

/s/ Jamie C. S. Madriaga
JAMIE C. S. MADRIAGA
DUANE R. MIYASHIRO
Attorneys for Defendants
TEVA PHARMACEUTICALS USA,
INC., TEVA WOMEN'S HEALTH,
INC., TEVA WOMEN'S HEALTH,
LLC, THE COOPER COMPANIES,
INC., AND COOPERSURGICAL, INC.

2

CASE LOMBARDI & PETTIT
A Law Corporation

MICHAEL L. LAM                          4260-0
MLL@CASELOMBARDI.COM
STEVEN E. TOM                           9048-0
ST@CASELOMBARDI.COM
737 Bishop Street, Suite 2600
Pacific Guardian Center – Mauka Tower
Honolulu, Hawaii 96813
Telephone: (808) 547-5400
Facsimile: (808) 523-1888

RANDI KASSAN             NYBA No. 4375754
RKASSAN@THESANDERSFIRM.COM
Sanders Phillips Grossman
100 Garden City Plaza, Suite 500
Garden City, New York 11530

Telephone: (516) 741-5600

(*admitted pro hac vice*)

Attorneys for Plaintiff
**JONELLE KIRKPATRICK**

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| JONELLE KIRKPATRICK, | CASE NO: 1:20-cv-00444-DKW-KJM |
|---|---|
| Plaintiff, | **PLAINTIFF JONELLE KIRKPATRICK'S NOTICE OF WITHDRAWAL WITHOUT PREJUDICE OF HER MOTION TO STAY PROCEEDINGS PENDING A DECISION BY THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION [DKT. 20]; CERTIFICATE OF SERVICE** |
| v. | |
| TEVA PHARMACEUTICALS USA, INC.; TEVA WOMEN'S HEALTH, INC. d/b/a TEVA WOMEN'S HEALTH, LLC; THE COOPER COMPANIES, INC.; and COOPERSURGICAL, INC., | |
| Defendants. | Hearing:<br>Date: January 14, 2020<br>Time: 9:30 a.m.<br>Judge: Honorable Derrick K. Watson |

9999/531/3473021.1

**PLAINTIFF JONELLE KIRKPATRICK'S NOTICE OF WITHDRAWAL
WITHOUT PREJUDICE OF HER MOTION TO STAY PROCEEDINGS
PENDING A DECISION BY THE JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION [DKT. 20]**

COMES NOW, Plaintiff Jonelle Kirkpatrick ("Plaintiff"), by and through her

attorneys Case Lombardi & Pettit, hereby withdraws, without prejudice her

*MOTION TO STAY PROCEEDINGS PENDING A DECISION BY THE JUDICIAL*

*PANEL ON MULTIDISTRICT LITIGATION [DKT. 20]* ("Motion").

The Motion has been set for hearing before the Honorable Derrick K. Watson

on Thursday, January 14, 2021 beginning at 9:30 a.m.

Dated: Honolulu, Hawaii, December 9, 2020 .


/s/ *Steven E. Tom*_____
MICHAEL L. LAM
STEVEN E. TOM
RANDI KASSAN (*admitted pro hac*)

Attorneys for Plaintiff
**JONELLE KIRKPATRICK**